Kimberley Hanks McGair, OSB #984205
kmcgair@fwwlaw.com
Trish A. Walsh, OSB #101604
twalsh@fwwlaw.com
Farleigh Wada Witt
121 SW Morrison Street, Suite 600
Portland, Oregon 97204-3136
Telephone: (503) 228-6044
Facsimile: (503) 228-1741

     Attorneys for Defendant OnPoint Community Credit Union

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON,

## PORTLAND DIVISION

| | |
|---|---|
| DAVID McDONALD, | Case No. 3:16-cv-01649-YY |
| Plaintiff, | DEFENDANT ONPOINT COMMUNITY CREDIT UNION'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| ONPOINT COMMUNITY CREDIT UNION, a federally insured credit union; EQUIFAX INFORMATION SERVICES, LLC, a foreign limited liability company; EXPERIAN INFORMATION SOLUTIONS, INC., a foreign business corporation; and TRANS UNION, LLC, a foreign limited liability company, | Request for Oral Argument |
| Defendants. | |

## L.R. 7-1 Certificate of Compliance

     Pursuant to Local Rule 7-1(a), counsel for Defendant OnPoint Community Credit Union certifies that she conferred with counsel for Plaintiff by telephone and that the parties were unable to resolve the claims, defenses and issues raised within this motion.

///

///

Page 1 -  DEFENDANT ONPOINT COMMUNITY CREDIT UNION'S MOTION FOR
      SUMMARY JUDGMENT

## **MOTION**

Pursuant to Fed. Rule Civ. P. 56 ("FRCP"), Defendant OnPoint Community Credit Union ("OnPoint") moves the Court for an order granting summary judgment in its favor on the grounds that there are no genuine issues of material fact and OnPoint is entitled to judgment as a matter of law on each of Plaintiff's claims for relief.

This motion is supported by the Declaration of Veronica Ervin ("Ervin Dec."), the Declaration of Kimberley Hanks McGair ("McGair Dec."), the memorandum below, and the balance of the record in this matter.

## **MEMORANDUM**

## I.     **Summary of Argument.**

Plaintiff borrowed $600,000 from OnPoint secured by Plaintiff's real property. After Plaintiff's default in April 2010, OnPoint non-judicially foreclosed on the real property in December 2010. Because, the value of the real property was less than the amount owing on the loan, the foreclosure resulted in a loss to OnPoint of $195,960 on Plaintiff's loan. In compliance with ORS 86.797(2), OnPoint took no action to collect this deficiency balance.

Thereafter, since January 2011, OnPoint has accurately reported the account to the credit reporting agencies ("CRAs") in its regular monthly reporting as an unsecured, charged off, closed account, with a date of first default of April 13, 2010. OnPoint also correctly and consistently reported the original charge off amount as $195,960 and the date that the account was closed, which was January 21, 2011. In 2016, OnPoint received several notices of dispute from the CRAs, stating that Plaintiff disputed that the account was his. OnPoint investigated the disputes and confirmed that the account was, in fact, Plaintiff's.

Plaintiff then filed this lawsuit, alleging that OnPoint "fraudulently" reported the account to the CRAs. Plaintiff alleges that OnPoint provided inaccurate information to the CRAs beginning in January 2011 and failed to fulfill its investigation and reinvestigation and

other obligations under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(a) and (b). Plaintiff also alleges that OnPoint's credit reporting violated Oregon's Unlawful Trade Practices Act ("UTPA") and Unfair Debt Collection Practices Act ("UDCPA").

Plaintiff's claims should be dismissed because there are no genuine issues of material fact and OnPoint is entitled to judgment as a matter of law. As discussed in more detail below, Plaintiff's FCRA claim fails because there is no private right of action under 15 U.S.C. § 1681s-2(a), and OnPoint conducted a reasonable investigation and reinvestigation of the dispute for purposes of 15 U.S.C. § 1681s-2(b). Further, Plaintiff's state law claims relate to the obligations of furnishers of information to CRAs and are therefore preempted by Section 1681t(b)(1)(F) of the FCRA and subject to dismissal. Finally, Plaintiff's state law claims fail because OnPoint properly reported Plaintiff's debt and took no other collection action.

## II.    Factual Background.

### A.  The Subject Account and Foreclosure.

Plaintiff David McDonald became a member of OnPoint (then known as Portland Teachers Credit Union) on or about June 21, 1999. Ervin Dec. ¶ 2. About a month later, he added a joint owner to his membership account—one of his sons, also named David McDonald. *Id*. ¶ 2.[1] Shortly thereafter, Plaintiff began borrowing money from OnPoint, using the real property that his mother had given him, located at 19784 Wildwood Drive, Lake Oswego, Oregon ("Property"), as collateral. *Id*. ¶ 2; McGair Dec., Ex. 1 (McDonald Dep. p. 25, line 14 – p. 26, line 15; p. 20, line 17 – p. 21, line 9).

On or about October 16, 2007, Plaintiff executed and delivered to OnPoint a Modification of Trust Deed granting OnPoint a security interest in the Property to secure Plaintiff's obligations to repay $600,000 to OnPoint on a line of credit ("Account"). *Id*. ¶ 3, Ex.

---

[1] Plaintiff David McDonald has three sons named David McDonald. McGair Dec., Ex. 1 (McDonald Dep. p. 11, line 13 – p. 12, line 20).

1.[2]

   On or about March 15, 2010, Plaintiff paid $4.50 on the Account. *Id*. ¶ 4, Ex. 2. That was the last payment that Plaintiff made on the Account. *Id*. As of July 2, 2010, the principal amount of $592,396.65 remained owing on the Account, plus interest and late charges. *Id*. ¶ 4.

   As a result of Plaintiff's default, OnPoint foreclosed its security interest in the Property through a non-judicial foreclosure on December 8, 2010. *Id.* ¶ 5. OnPoint was the sole bidder at the sale. *Id*. The foreclosure sale and related accounting entries left a balance of $195,960 still owing on the Account. *Id*. ¶ 5, Ex. 3. Because the collateral for the Account had been foreclosed upon, the remaining balance was unsecured. *Id.* In compliance with ORS 86.797(2), OnPoint did not file an action for a deficiency judgment. *Id*. ¶ 6. Instead, OnPoint charged off the $195,960 balance of the Account and closed the Account as of January 21, 2011. *Id*.

### B. The Reporting.

   Each month, OnPoint submits an electronic file through an automated process to the CRAs to report information on accounts. *Id*. ¶ 6. Since January 2011, OnPoint has accurately reported the Account to the CRAs as an unsecured, charged off, closed account, with a date of first default of April 13, 2010, with an original charge off amount of $195,960 and the account closed date of January 21, 2011. *Id*. ¶ 6, Ex. 4.[3]

### C. The Disputes.

   Between April 11, 2016, and April 27, 2016, OnPoint electronically received,

---

[2] Note that the Account is identified in OnPoint's records as loan number 156, or by his membership account number plus the suffix -156.

[3] OnPoint created a report for purposes of this litigation which shows the data that was transmitted to the CRAs in its electronic monthly reporting. The report is voluminous; therefore, OnPoint submits as Exhibit 4 to the Ervin Dec. only the pages of the report showing the period January through July 2016. Note that, in this exhibit, in accordance with Consumer Data Industry Association guidelines, "Account Status: 97" means "Unpaid balance reported as a loss—charge-off." Ervin Dec. ¶ 6. In addition, "Account Type: 01" means "Unsecured." *Id*.

through an online portal called E-Oscar, three notices of dispute, or Automated Customer Dispute Verifications ("ACDVs"), from three of the CRAs: Equifax Information Services, LLC. ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union LLC ("Trans Union"). *Id*. ¶ 7, Ex. 5.[4]  The substance of Plaintiff's disputes, as listed on the ACDVs, was that Plaintiff disputed that the Account belonged to him. *Id*.  Specifically, the dispute codes listed on the Equifax and Trans Union ACDVs read, "[n]ot his/hers. Provide or confirm complete ID" and the dispute code listed on the Experian ACDV read "[b]elongs to another individual with same/similar name. Provide or confirm complete ID (including Social Security Number, Date of Birth, Generation Code, etc.)." *Id*. For each of the three ACDVs, an associated image was transmitted which, presumably, was a copy of the actual disputes from Plaintiff that Plaintiff provided to the CRAs. *Id.*; *see, e.g.*, Ervin Dec., Ex. 5 p. 2 (OPCCU166, "Associated Images: Yes").  For example, Plaintiff sent an April 3, 2016, letter to Experian, stating "OnPoint has placed a collection on my credit report. Number 766080156. Remove this collection. I do not have an unsecured loan with OnPoint." McGair Dec., Ex. 1 (McDonald Dep., Ex. 21).

Based on the dispute codes that indicated that Plaintiff was disputing that the Account was his, which was consistent with the letters that Plaintiff had sent to the CRAs, OnPoint's collection department reviewed OnPoint's records in its core system for ownership information regarding the Account and confirmed that the Account did, in fact, belong to Plaintiff.  Ervin Dec. ¶ 8.  OnPoint responded to the disputes indicating that the ownership was accurately reported. *Id.*

For example, in its response to the Equifax dispute, OnPoint indicated a "D" for "different" as to Plaintiff's middle name, as its review showed "Patrick" as David McDonald's

---

[4] The ACDVs were electronic and OnPoint does not retain them. However, the documents at Exhibit 5 to the Ervin Dec. are copies of OnPoint's draft responses which were printed just prior to submission to each of the CRAs.  Ervin Dec. ¶ 7.

Page 5 -    DEFENDANT ONPOINT COMMUNITY CREDIT UNION'S MOTION FOR
            SUMMARY JUDGMENT

middle name. *Id.*, Ex. 5, p. 1.[5]  In addition, OnPoint indicated a "D" for address, as Plaintiff's last known address in its records was different than the address showing on the ACDV. However, OnPoint indicated "S" for "same" with respect to the Social Security Number and Date of Birth. *Id.*  Subject to those notations, OnPoint timely responded to the ownership dispute by stating that the Account information was "accurate." *Id.*

Two months later, Between June 18 and 21, 2016, OnPoint again received through E-Oscar three notices of dispute from Equifax, Experian, and Trans Union regarding the Account.  *Id.* ¶ 9, Ex. 6.  Those disputes again identified the substance of the disputes as ownership of the Account.  *Id.* (showing the same dispute codes).[6]  The letter that Plaintiff provided to Experian, for example, states, in pertinent part, that "I told you I never had this Loan. . . . Removed [sic] this debt from my credit report ASAP, I never had a unsecured loan with OnPoint CU."  McGair Dec., Ex. 1 (McDonald Dep., Ex. 23).

Again, OnPoint's collection department reviewed OnPoint's records in its core system for ownership information regarding the Account and again confirmed that the Account did belong to Plaintiff.  Ervin Dec., ¶ 10.  OnPoint responded to the disputes indicating that the ownership was accurately reported.  *Id.*

Plaintiff then filed this lawsuit, alleging that OnPoint "fraudulently" reported the account to the CRAs.  As discussed below, OnPoint is entitled to summary judgment on each of Plaintiff's claims.

## III.    Legal Argument.

### A. Applicable Standard.

Summary judgment is "appropriate where 'the pleadings, depositions, answers to

---

[5] OnPoint subsequently determined that "Patrick" was the middle name of the joint membership account holder, Plaintiff's son David McDonald, and updated its monthly reporting to reflect Plaintiff's correct middle initial of "J."  Ervin Dec. ¶ 8.

[6] Note that, in June 2016, OnPoint received approximately 26 ACDVs from CRAs regarding disputes that Plaintiff submitted regarding various of his accounts at OnPoint, and the substance of each of the disputes was ownership of the accounts.  Ervin Dec. ¶ 10.

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Thomas v. U.S. Bank, N.A.*, No. CV05-1725-MO, 2007 WL 764312, at *2 (D. Or. Mar. 8, 2007) (*quoting* FRCP 56(c)). "The moving party bears the initial burden of 'pointing out' the absence of a genuine issue of fact." *Id.* (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). That is, the moving party must demonstrate that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.,* 477 U.S. at 325.

In response, the non-moving party must then set forth "specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting* FRCP 56(e)). "A mere disagreement about a material issue of fact is not in itself sufficient to preclude an award of summary judgment." *Jackson v. Bank of Haw*., 902 F.2d 1385, 1389 (9th Cir. 1990). "[I]f the factual context makes the nonmoving party's claims implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Id.* (*quoting California Architectural Bldg. Prods. Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987)). "The underlying substantive law governing the claims determines whether or not [a factual issue] is material." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). In summary, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## B.   Plaintiff's FCRA Claim Fails as a Matter of Law.

### 1.   Overview of Section 1681s-2 of the FCRA

"Congress enacted the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681– 1681x, in 1970 'to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy.'" *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1153 (9th Cir. 2009) (*quoting Safeco Ins. Co. of Am. V. Burr*, 551 U.S. 47 (2007)). "[T]o ensure

that credit reports are accurate, the FCRA imposes some duties on the sources that provide credit information to CRAs, called furnishers in the statute." *Id.*

"Section 1681s-2 sets forth '[r]esponsibilities of furnishers of information to consumer reporting agencies,' delineating two categories of responsibilities. Subsection (a) details the duty 'to provide accurate information[.]'" *Id.* at 1154. (Gorman) "Section 1681s-2(b) imposes a second category of duties on furnishers of information. These obligations are triggered 'upon notice of dispute'—that is, when a person who furnished information to a CRA receives notice from the CRA that the consumer disputes the information." *Id.* (*citing* Section 1681i(a)(2) (requiring CRAs promptly to provide such notification containing all relevant information about the consumer's dispute).

Subsection 1681s-2(b) provides that, after receiving a notice of a dispute, the furnisher shall:

> (A)    conduct an investigation with respect to the disputed information;
>
> (B)    review all relevant information provided by the [CRA] pursuant to section 1681i(a)(2) . . . ;
>
> (C)    report the results of the investigation to the [CRA];
>
> (D)    if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the person furnished the information . . . ; and
>
> (E)    if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1) . . . (i) modify . . . (ii) delete [or] (iii) permanently block the reporting of that item of information [to the CRAs].

*Id.* (*quoting* Section 1681s-2(b)(1)). However, "[t]hese duties arise only after the furnisher receives notice of dispute from a CRA; notice of a dispute received directly from the consumer does not trigger furnishers' duties under subsection (b)." *Id.* (*citing* Section 1681s-2(b)(1); *Nelson v. Chase Manhattan Mortgage Corp.*, 282 F.3d 1057, 1059–60 (9th Cir. 2002)).

"The FCRA expressly creates a private right of action for willful or negligent noncompliance with its requirements." *Id.* (*citing* Sections 1681n & o; *Nelson*, 282 F.3d at 1059).

"However, § 1681s-2 limits this private right of action to claims arising under subsection (b), the duties triggered upon notice of a dispute from a CRA." *Id*. (*citing* Section 1681s-2(c)).

### 2. There Is No Private Right of Action to Enforce Section 1681s-2(a).

Plaintiff's Complaint alleges violations of both Sections 1681s-2(a) and (b). *See* First Am. Compl. ¶ 26 (Dkt. No. 33 at 8). However, "[d]uties imposed on furnishers under subsection (a) are enforceable only by federal or state agencies." *Gorman*, 584 F.3d at 1153 (*citing* Section 1681s-2(d)); *see also Nelson v. Chase Manhattan Mortgage Corp*., 282 F.3d 1057, 1059 (9th Cir. 2002). Therefore, Plaintiff's FCRA claim based on Section 1681s-2(a) should be dismissed as a matter of law.[7]

### 3. Plaintiff's Section 1681s-2(b) Claim Also Fails as a Matter of Law.

In addition, as discussed more fully below, Plaintiff's FCRA claim based on Section 1681s-2(b) also fails as a matter of law—chiefly because OnPoint's investigation of Plaintiff's disputes was reasonable given the nature of Plaintiff's dispute, which was limited to ownership of the Account.

### a. OnPoint Conducted a Reasonable Investigation of the April 2016 Disputes.

The furnisher's investigation pursuant to Section 1681s-2(b) must be reasonable. *Id*. at 1157. Specifically, "a furnisher's obligation to conduct a reasonable investigation under § 1681s-2(b)(1)(A) arises when it receives a notice of dispute from a CRA. Such notice must include 'all relevant information regarding the dispute that the [CRA] has received from the consumer.'" *Gorman*, 584 F.3d at 1157 (quoting Section 1681i(a)(2)(A)). "It is from this notice that the furnisher learns the nature of the consumer's challenge to the reported debt, and it is the receipt of this notice that gives rise to the furnisher's obligation to conduct a reasonable investigation." *Gorman*, 584 F.3d at 1157.

---

[7] In OnPoint's efforts to confer on this motion, Plaintiff's counsel indicated that he agreed that Plaintiff does not have a private right of action under this section. However, because the claim has not been dismissed, OnPoint has included it in this motion.

Therefore, in determining whether summary judgment is appropriate, "[t]he pertinent question is thus whether the furnisher's procedures were reasonable <u>in light of what it learned about the nature of the dispute from the description in the CRA's notice of dispute</u>." *Gorman*, 584 F.3d at 1157 (*citing Westra*, 409 F.3d at 827 ("[The furnisher's] investigation in this case was reasonable given the scant information it received regarding the nature of [the consumer's] dispute.")) (underline added).  As the Ninth Circuit has noted, "an inadequate CRA notification may limit the scope of a furnisher's § 1681s-2(b) duty, for example, by excusing a more limited investigation[.]" *Drew v. Equifax Information Servs., LLC*, 690 F.3d 1100, 1107 (9th Cir. 2012).

Although reasonableness may be a jury question in some cases, the Ninth Circuit has held that "summary judgment is not precluded altogether on questions of reasonableness. It is appropriate 'when only one conclusion about the conduct's reasonableness is possible.'" *Gorman*, 584 F.3d at 1157 (considering the sufficiency of a furnisher's investigation with respect to each of the notices of dispute that it received from a CRA and affirming summary judgment in favor of the furnisher as to reasonableness of its investigations of the disputes).  The Plaintiff bears the burden of showing the investigation was unreasonable.  *Id.*

"The reasonableness of an investigation depends on the facts of the particular case, most importantly the CRA's description of the dispute in its notice." *Gorman*, 584 F.3d at 1160.  The Ninth Circuit has "emphasize[d] that the requirement that furnishers investigate consumer disputes is procedural. An investigation is not necessarily unreasonable because it results in a substantive conclusion unfavorable to the consumer, even if that conclusion turns out to be inaccurate." *Gorman*, 584 F.3d at 1160.

The *Gorman* case is illustrative.  In that case, a consumer paid for delivery of a satellite TV system on a Visa card issued by a bank. The consumer was dissatisfied with the TV system and attempted unsuccessfully to obtain a refund from the vendor.  The consumer notified the bank that he was disputing the Visa charges because he was rejecting the TV equipment, but

he never returned the equipment to the vendor. Ultimately, after the consumer stopped paying on his Visa card, the bank reported his account as charged off.  The consumer sent disputes to the CRAs, alleging that their credit reports contained inaccurate information. The CRAs sent the bank notices of dispute, containing descriptions of the complaints (as understood by the CRAs) and asking the bank to verify the accuracy of his account records. The bank responded by reviewing the account records and notes. After ascertaining that its prior investigation did not support the consumer's claimed dispute, the bank notified the CRAs that the delinquency was not an error. The consumer then sued the bank alleging violations of the FCRA. The Court of Appeals affirmed in part and reversed in part the district court's grant of summary judgment on the FCRA claims.

In particular, one of the notices of dispute from the CRA in that case read "claims company will change. Verify all account information." *Gorman*, 584 F.3d at 1157.  In response to the notice, the furnisher reviewed account notes to determine whether the furnisher had agreed to delete any charges or to modify the account information in any way. It concluded that no such commitment had been made. The furnisher's review of the account information revealed some minor differences in the dispute, and so the furnisher updated the address, date of birth, and account delinquency information to the CRA. The Court reasoned that the cursory notation "[c]laims company will change," provided no suggestion of the nature of the plaintiff's dispute with the TV vendor. The Ninth Circuit concluded, therefore, that a jury could not find the furnisher's response unreasonable. The furnisher "reasonably read the vague notice as indicating that [the furnisher] had previously agreed to change certain account information. [The furnisher's] review of its internal account files to determine whether any such agreement had been reached was all that was required to respond reasonably to this notice of dispute . . . [The furnisher] could not have reasonably been expected to undertake a more thorough investigation of the [TV vendor] incident based on the scant information contained in this notice." *Gorman*, 584 F.3d at 1158.

*Gunderson v. Experian Information Solutions Inc.,* No. 2:14-cv-01454-ODW, (2015 WL 347707 C.D. Cal June 2, 2015), is also instructive.  As in this case, the furnisher received two separate disputes, a few months apart, that the accounts were "not his/hers."  *Id.* at *4-5.  The furnisher investigated the disputes and confirmed the consumer's identity, and reported to the CRA that the reported information was accurate.  *Id.*  The court granted summary judgment for the furnisher stating that, "both notices questioned the identity and accuracy of the tradelines, therefore . . . [the furnisher] was only responsible for confirming the information for each tradeline and reporting the verified information" to the CRA.  *Id.*

The Court should reach the same conclusion in this case.  OnPoint's investigation was patently reasonable.  The substance of the disputes, as described in the notices of dispute received from Experian, Trans Union and Equifax, was that Plaintiff disputed that the Account was his.  OnPoint reviewed its records and confirmed that the Account was, in fact, Plaintiff's— which was accurate.  Nothing about Plaintiff's dispute indicated to OnPoint that the real substance of his dispute was that his payment history on the Account was inaccurate or any other allegedly inaccurate information appeared on his credit reports.  Plaintiff admitted in his deposition that he never notified the CRAs about a dispute regarding the payment history on the Account. McGair Dec., Ex. 1 (McDonald Dep. p. 107, lines 19 – p. 108, line 3).

### b.  OnPoint Conducted a Reasonable Reinvestigation of the June 2016 Disputes.

OnPoint also conducted a reasonable reinvestigation of Plaintiff's June 2016 disputes as a matter of law.  In the Ninth Circuit, "[w]hether a reinvestigation conducted by a furnisher in response to a consumer's notice of dispute is reasonable . . . depends in large part on . . . the allegations provided to the furnisher by the credit reporting agency." *Gorman*, 584 F.3d at 1160 (*quoting Krajewski v. Am. Honda Fin. Corp.*, 557 F. Supp.2d 596, 610 (E.D. Pa. 2008)).  Gorman specifically addressed a furnisher's reinvestigation obligations when a consumer files serial or duplicate disputes, holding:

Importantly, the CRA notice of dispute that triggered [the furnisher's] duty to investigate did not identify any reason to doubt the veracity of the initial investigation. Furthermore, the notice of dispute did not provide any new information that would have prompted [the furnisher] to supplement the initial investigation with any additional procedures or inquiries . . . <u>Without any indication in the allegations that the initial investigation lacked reliability or that new information was available to discover, [the furnisher's] decision not to repeat a previously-conducted investigation cannot have been unreasonable.</u> Congress could not have intended to place a burden on furnishers continually to reinvestigate a particular transaction, without any new information or other reason to doubt the result of the earlier investigation, every time the consumer disputes again the transaction with a CRA because the investigation was not resolved in his favor.

*Gorman*, 584 F.3d at 1160. (emphasis supplied).

Note also that OnPoint was not required to contact Plaintiff and attempt to glean more information from him regarding the nature of his dispute. "Requiring a furnisher to automatically contact every consumer who disputes a debt would be terribly inefficient and such action is not mandated by the FCRA." *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005) (explaining that the fact that the furnisher did not contact the consumer directly in the process of investigating the dispute did not make its investigation unreasonable and affirming summary judgment in favor of the furnisher).

Here, OnPoint conducted a reasonable reinvestigation as a matter of law. It reviewed the information provided regarding the substance of Plaintiff's disputes—which, again, appeared to be limited to ownership of the Account. OnPoint reviewed its records and confirmed again that the Account was, in fact, Plaintiff's. Given that there was no other disputed information, and given that Plaintiff had also disputed ownership of various other accounts at OnPoint which were also indisputably his, OnPoint conducted a reasonable reinvestigation into whether the Account was his and determined—accurately—that it was.

### C. Plaintiff's State UDCPA and UTPA Claim is Preempted by FCRA as a Matter of Law.

Plaintiff also has alleged a violation of Oregon's UDCPA and UTPA based on OnPoint's reporting of the Account. Specifically, Plaintiff has alleged that OnPoint

"fraudulently" reported to the CRAs that Plaintiff had an unsecured loan originating in 2007 for $600,000 with a balance of $195,960 that had been charged off, and failed to report to the CRAs Plaintiff's "lack of personal liability" on the charged-off Account. *See* First Am. Compl. ¶ 29 (Dkt. No. 33 at 10). Plaintiff alleges that this alleged fraudulent credit reporting violated the UTPA and/or the UDCPA in that the credit reporting allegedly: (1) disparaged Plaintiff's credit, (2) constituted false or misleading representations concerning credit availability or the nature of the transaction or obligation incurred, (3) continued after OnPoint received notices of dispute from the CRAs, and (4) was updated in such a way that would extend the reporting for an additional 7.5 years after Plaintiff disputed the credit reporting. *Id.*[8] However, Plaintiff's state statutory claim(s) under the UTPA and/or UDCPA are preempted by the FCRA and should be dismissed as a matter of law.

"In general, the FCRA does not preempt any state law 'except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency.'" *Gorman*, 584 F.3d at 1166 (*quoting* 15 U.S.C. § 1681t(a)). "But this general rule has several exceptions, added in 1996, including" as follows:

> No requirement or prohibition may be imposed under the laws of any State . . . with respect to any subject matter regulated under . . . section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies, except that this paragraph shall not apply—
>
> (i)      with respect to section 54A(a) of chapter 93 of the Massachusetts Annotated Laws (as in effect on September 30, 1996); or
>
> (ii)     with respect to section 1785.25(a) of the California Civil Code (as in effect on September 30, 1996).

*Gorman*, 584 F.3d at 1166 (*quoting* 15 U.S.C. § 1681t(b)(1)(F)). In other words, Section 1681t(b)(1)(F) "appears to preempt all state law claims based on a creditor's responsibilities under § 1681s-2[.]" *Id.*

---

[8] Note that Plaintiff seeks damages under ORS 646.641 (under the OUDCPA), but not ORS 646.638 (which provides for a civil action by a private party for violations of the UTPA, ORS 646.608). *See* First Am. Compl. ¶ 31 (Dkt. No. 33 at 11).

Page 14 -   DEFENDANT ONPOINT COMMUNITY CREDIT UNION'S MOTION FOR
            SUMMARY JUDGMENT

Section 1681h(e), another FCRA provision addressing preemption, provides, in part, that:

> Except as provided in sections 1681n and 1681o of this title no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against . . . any person who furnishes information to a consumer reporting agency, . . . except as to false information furnished with malice or willful intent to injure such consumer.

15 U.S.C. § 1681h(e).

The district courts have recognized that FCRA's two preemption provisions have created tension with regard to the preemption of state common-law claims. *Decker v. GEMB Lending, Inc.*, No. 3:12-cv-632-AC, 2012 WL 5304144, at *6 (D. Or. Sept. 13, 2012), *findings and recommendation adopted*, 2012 WL 5304093 (D. Or. Oct. 25, 2012). The district courts have generally taken three different approaches in an attempt to reconcile these two provisions. Specifically, those three approaches are as follows:

> The "total preemption" approach, the "temporal" approach, and the "statutory" approach. Under the "total preemption" approach, t(b)(1)(F) does indeed preempt all state law claims against furnishers of credit information arising from the conduct regulated by 1681 s-2, thus effectively repealing the earlier preemption provision, 1681 h(e). Under the "temporal" approach, preemption depends on whether the cause of action arises before or after a credit information furnisher has notice of a consumer dispute. Finally, under the "statutory" approach, t(b)(1)(F) preempts only state law claims against credit information furnishers brought under state statutes, just as 1681h(e) preempts only state tort claims.

*Decker*, 2012 WL 5304144, at *6 (*quoting Manno v. Am. Gen. Fin. Co.*, 439 F. Supp. 2d 418, 424–25 (E.D. Pa. 2006)).

"[T]he majority view in the Ninth Circuit is that section 1681t(b)(1)(F) totally preempts all state statutory and common law causes of action that fall within the conduct proscribed under section 1681s-2." *Finley v. Capital One*, No. 16-cv-01392-YGR, 2017 WL 1365207, at *4 (N.D. Cal. April 14, 2017).

The District of Oregon "has addressed preemption under the [FCRA] on at least four occasions with the majority, and the most recent, cases specifically adopting the 'statutory approach.'" *Decker*, 2012 WL 5304144, at *7. "Judge Brown first addressed the question in

2006, finding that plaintiff's claim for defamation was barred by either preemption provision." *Decker*, 2012 WL 5304144, at *7 (*citing Cope v. MBNA Am. Bank, NA*, No. 04-CV-493-BR, 2006 WL 655742, at *9 (D. Or. Mar. 8, 2006) (dismissing as preempted by the FCRA plaintiff's claim that defendant willfully, deliberately, intentionally and/or recklessly defamed her when it informed Experian and other CRAs that plaintiff was responsible for a certain account because the claim constituted a prohibition imposed under the laws of any State relating to the responsibilities of persons who furnish information to the CRAs)).

The following year, "Judge Mossman considered whether a plaintiff's claims under the [Oregon Unlawful Debt Collection Practices Act ("OUDCPA")] and Oregon's Unlawful Trade Practices Act were preempted by the [FCRA]." *Decker*, 2012 WL 5304144, at *7 (*citing Thomas v. U.S. Bank, N.A.*, No. CV 05-1725-MO, 2007 WL 764312, at *8 (D. Or. Mar. 8, 2007)). "Judge Mossman found that the unlawful trade practices claim, based on willfully made false or misleading representations, was entirely preempted by § 1681t(b)(1)(F) but that the claim brought under the [OUDCPA], which alleged unlawful collection efforts, not the reporting of information, was not preempted." *Decker*, 2012 WL 5304144, at *7 (*citing Thomas v. U.S. Bank, N.A.*, No. CV 05-1725-MO, 2007 WL 764312, at *8–*9 (D. Or. Mar. 8, 2007)).

In *Weseman v. Wells Fargo Home Mortg. Inc.*, Judge Stewart adopted the "statutory" approach because "'in enacting [§ 1681t(b)(1)(F), Congress seems to have been most concerned with protecting credit information furnishers from state statutory obligations inconsistent with their duties under the FCRA.'" *Weseman v. Wells Fargo Home Mortg. Inc.*, No. CV-06-1338-ST, 2008 WL 542961, at *4 (D. Or. Feb. 22, 2008) (*quoting Manno*, 439 F. Supp. 2d at 425). Judge Stewart noted that "the two [preemption] provisions 'can easily be read together to shield credit information furnishers against, on the one hand, state statutory claims, and on the other hand, state tort actions not involving willful or malicious conduct.'" *Id.* (*quoting Manno*, 439 F. Supp. 2d at 426). Judge Simon also adopted the statutory approach in *Blair v.*

*Bank of Am., N.A.*, No. 10-cv-946-SI, 2012 WL 860411, at *6–*7 (D. Or. Mar. 13, 2012). Finally, in *Decker*, Judge Acosta also found "the 'statutory' approach the correct reading of the FCRA and adopted the reasoning of Judge Stewart, concurred in by Judge Mossman, and also adopted by Judge Simon." *Decker*, 2012 WL 5304144, at *8 (finding that the plaintiff's common law claims for fraud, negligence and defamation were governed by Section 1681 h(e) and were preempted by the FCRA unless based on allegations that false information was furnished with malice or willful intent to injure the plaintiff).

Based on the above, under *either* the total preemption approach *or* the statutory approach, Section 1681t(b)(1)(F) preempts all Oregon state statutory laws—including the UDCPA and the UTPA—that regulate a furnisher's duty to provide accurate information to CRAs. *See Thomas*, 2007 WL 764312, at *8 (*citing* 15 U.S.C. § 1681t(b)(1)(F)) ("The FCRA preempts all state laws regulating a furnisher's duty to provide accurate information . . . to the extent [that] UDCPA and UTPA claims are based on allegations that the bank reported false and obsolete information, they are preempted by the FCRA."). As Judge Mossman explained, "[t]he UTPA proscribes making 'false or misleading representations concerning credit availability or the nature of the transaction or obligation incurred.'" *Id.* (*quoting* ORS § 646.608(1)(k)). Therefore, a claim that a furnisher willfully made a false or misleading representation of fact in violation of the UTPA is entirely preempted by the FCRA. *Id.* (*citing* 15 U.S.C. § 1681t(b)(1)(F)); *see also*, *e.g.*, *Peters v. Discover Bank*, 649 Fed. App'x 405, 408 (9th Cir. 2016) (explaining that, to the extent that a claim against a furnisher on an alleged California debt collection statute violation related to credit reporting, it was preempted by the FCRA).

Here, Plaintiff's state law claims are all based on the same allegations as his FCRA claim and relate solely to OnPoint's credit reporting on the Account. Plaintiff has not alleged any debt collection practices other than the credit reporting and OnPoint's obligation as a furnisher to provide accurate information to the CRAs. Plaintiff confirmed as much in his deposition, as follows:

Q. . . . Did OnPoint ever file a lawsuit against you to collect the deficiency
balance?
A. I'd like to answer that with a statement.

Q.  I would just like your answer.
A.  The law forbids it, so they didn't.

Q.  Did OnPoint pursue or obtain a judgment against you for the deficiency
balance?
A.  No, they did not.

Q.  Did OnPoint garnish your wages to collect the deficiency balance?
A.  No, they did not.

Q.  Did OnPoint garnish your bank accounts to collect the deficiency balance?
A.  No, they did not.

Q.  Did OnPoint contact you at any time in order to collect the deficiency
balance?
A.  No, they did not.

Q.  Did OnPoint send you a demand to pay the deficiency?
A.  No, ma'am, they didn't.

Q. So when you say that OnPoint did take actions to collect the deficiency
balance, are you referring exclusively to the credit reporting?
A.  Well, that's what I seen in the credit report, and I use Google, and I shouldn't.
I'm dangerous. So you got to forgive me there. I don't know.

Q.  I'm just going to repeat the question so we have a clear record.
A.  I want to make it clear for you too.

Q.  When you say that OnPoint has taken action to collect the deficiency balance
from you, you are referring exclusively to the credit reporting?
A.  That they reported to the credit bureaus, three of them.

Q. Okay. And that's the only way—
A. That is a collection activity.

Q.  That's the only way that you allege that OnPoint has tried to collect the
deficiency from you is by the credit reporting?
A. Yeah . . .

McGair Dec., Ex. 1 (Apr. 19, 2017, McDonald Dep. p. 65, line 8 – p. 66, line 16); see also

McGair Dec., Ex. 2 (OnPoint's First Request for Admissions, which Plaintiff failed to timely

deny).    Because Plaintiff's claims are based solely on credit reporting, they are preempted by

FCRA and should be dismissed as a matter of law.

**D.  There is No Genuine Issue of Material Fact as to the Merits of Plaintiff's UTPA and UDCPA Claims.**

In addition to the preemption of Plaintiff's UTPA and UDCPA claims, they also fail on their merits.  Plaintiff alleges four violations of these statutes in paragraph 29 of his First Amended Complaint (Dkt. No. 33 at 10).  While he does not identify the specific statutory sections under which he makes his claims, they appear to be as follows:  1)  disparaging the credit of a customer by false or misleading representations of fact (ORS 646.608(1)(h)); 2)  making false or misleading representation concerning credit availability or the nature of the transaction or obligation incurred (ORS 646.608(1)(k)); 3)  continuing false reporting after contact by the CRAs (no applicable section of the UTPA or UDCPA); and 4)  updated the credit reporting to extend the item report date (no applicable section of the UTPA or UDCPA).  Plaintiff's claims fail as a matter of law because there is no genuine issue of material fact that OnPoint did not violate the UTPA or the UDCPA.

As an initial mater, Plaintiff's state law claims depend on the faulty premise that the balance on the Account was extinguished after the foreclosure.  This is incorrect as a matter of law.  ORS 86.797(2) provides only that "an action for a deficiency may not be brought after a trustee's sale."  In other words, it only prohibits the lender from filing a lawsuit for the deficiency balance.  It does not discharge or extinguish the debt.  Consequently, because the deficiency balance remained, OnPoint's report of it was not improper in any manner, and reporting the balance was not "false" reporting.

Plaintiff's claim depends upon allegations that OnPoint made "false or misleading representations" of fact, and otherwise made false reports to the CRAs.  The undisputed facts establish that OnPoint did not make any false representations of fact, nor did it make any "false reports."  At all relevant times, OnPoint reported the deficiency balance on the Account as "charged off" with an account closed date of January 11, 2011. These representations were, without question, true and correct.  Thus, Plaintiff's claims arising from allegations of false or

misleading representations are without merit and should be dismissed. In addition, Plaintiff's second two allegations do not state a claim under either the UTPA or the UDCPA. No provision of either statute addresses credit reporting, presumably because governance of credit reporting by furnishers is preempted by federal law. Moreover, OnPoint did not "update" its reporting to extend any reporting date. It has reported the date as charged off, unsecured, and closed with a first default date of April 13, 2010, and a closed date of January 26, 2011 since January 2011. Ervin Dec., ¶ 6. In any event, because Plaintiff's allegations do not state a claim under Oregon law, they should be dismissed for that reason as well.

## IV.    Conclusion.

For the foregoing reasons, Defendant OnPoint Community Credit Union respectfully requests that the Court grant its Motion for Summary Judgment and dismiss Plaintiff's claims against OnPoint as a matter of law.

DATED September 6, 2017.

FARLEIGH WADA WITT


By: /s/ Kimberley Hanks McGair
Kimberley Hanks McGair, OSB #984205
Trish A. Walsh, OSB #101604
kmcgair@fwwlaw.com
twalsh@fwwlaw.com
(503) 228-6044
Attorneys for Defendant OnPoint
Community Credit Union

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Lisa R.J. Porter                                                              Attorneys for Plaintiff
JP Law PC
5200 SW Meadows Road, Ste. 150
Lake Oswego, OR  97035
lisa@jplawpc.com, nan@jplawpc.com,
nanette.mitchell007@gmail.com

Pedro Bernal Bilse
Bernal Law
750 B Street, Suite 1710
San Diego, CA  92101
pb@bernal-law.com

Jose Antonio Cervantes
Cervantes Hodges Law Firm
333 H Street, Suite 5000
Chula Vista, CA  91910
Antonio@cervanteshodges.com


Nicholas J. Henderson                                                    Attorneys for Defendant
Motschenbacher & Blattner, LLP                                      Trans Union LLC
117 SW Taylor St., Suite 200
Portland, OR  97204
nhenderson@portlaw.com, csturgeon@portlaw.com

Scott E. Brady
Sandra Davis Jansen
Schuckit & Associates, PC
4545 Northwestern Drive
Zionsville, IN  46077
sbrady@schuckitlaw.com, sjansen@schuckitlaw.com,
acormany@schuckitlaw.com, lrang@schuckitlaw.com,
mpate@schuckitlaw.com, rputerbaugh@schuckitlaw.com

Page 1 -    CERTIFICATE OF SERVICE

Reilley D. Keating
Stoel Rives LLP
760 SW Ninth Ave., Ste 3000
Portland, OR  97205
 rdkeating@stoel.com, dmholland@stoel.com,
docketclerk@stoel.com

Angela M. Taylor
Jones Day
3161 Michelson Drive, Suite 800
Irvine, CA  92612
angelataylor@jonesday.com

Theodore Roethke
Lewis P. Perling
King & Spalding LLP
1180 Peachtree Street
Atlanta, GA  30309
troethke@kslaw.com
lperling@kslaw.com

Jeffrey M. Edelson
Markowitz Herbold PC
1211 SW Fifth Avenue, Ste. 3000
Portland, OR  97204
JeffEdelson@MarkowitzHerbold.com

Attorneys for Defendant Experian
Information Services, Inc.

Attorneys for Defendant Equifax
Credit Information Services, LLC

FARLEIGH WADA WITT

By: /s/ Kimberley Hanks McGair
     Kimberley Hanks McGair, OSB #984205
     kmcgair@fwwlaw.com
     Trish A. Walsh, OSB #101604
     twalsh@fwwlaw.com
     121 SW Morrison St., Suite 600
     Portland, Oregon 97204
     (503) 228-6044 (phone)
     (503) 228-1741 (fax)

     Attorneys for OnPoint Community Credit
     Union

Page 2 -    CERTIFICATE OF SERVICE